to go to parties, family gatherings, weddings, whatever. Just everyday contact where people are hugging and kissing and showing affection physically. Now is that lewd and lascivious behavior? If that's lewd and lascivious behavior, then I know hundreds of people who should be arrested today for lewd and lascivious behavior. Okay, I'm sorry, Your Honor. But there was more than that. There wasn't more than that in the affidavit, and we're in the four corners of the affidavit. I'm sorry. There was more than that. I mean, she didn't just say that she was touched. If you exclude the penetration, you said that she was touched in bad places. And I thought in the denomination that she was touched on the chest, that she was touched between her legs, although we're not aware. But not penetration, which of course means she was under an underarm. That was very vague and nonsensical. Am I confused about those facts? You are partly confused about the facts because I believe you're referring to things in the interview that was attached to the report by Ms. Oyler. Okay? Where that is discussed very generally and obliquely and could be viewed a lot of different ways. But let's talk about what I think is one of the most important. It was. It was. It was included and would still have been included even after the redaction. There's nothing in the Oyler report that says she was removed or redacted. That's correct. So what the magistrate would have had in front of them, including the things not followed, including the things that you mentioned, would have been a report from the little girl that she had been touched in bad ways. And specifically in Oyler's case, that she had been touched on the chest and between the legs. I believe if you go back to that report, it doesn't say specifically. It was more gestures. It was very vague and ambiguous. There was nothing clear about it. It doesn't say that clearly. But more importantly, what was left out? She talked about a note when she was interviewed by Tittle. When the victim, Yuvia, was interviewed by Officer Tittle, she mentioned there was a note at her house. Well, Officer Tittle didn't go to the house and ask to see the note. But what came out later in discovering this case and what he should have done is gone to the house and see the note. What came out was the father, Rodriguez, classic textbook sexual assault incident divorce manipulation, had the girl write a note that said in her own handwriting, He touches me in private parts. He tickles me, which I don't like. Now, that was this girl's mantra that her father had her right. And she was told she was being, just like sexual molestation's manipulation, accusing people falsely of sexual molestation is child manipulation. Her father had her write a note, and this was her script. And if anybody had done one-on-one investigation in this case, they would have realized that her story was total manipulation. It was fabricated, and her father put it up to her because her father had her write a note that was her script. And this is basically what she's reporting to people, not anything specific. Why is it that she has a note in her handwriting? Why would that be evidence in fact that that's true? Because what came out is that her father put her up to writing it, and her father told her to repeat it, to memorize it. Well, I understand that, but it's one thing to separate them, which is what the first – but what – but he gets to be falsely accused of child molestation and, yes, gets to have a trial. Do you want to address the Minnell claim before you run out of time, please? Well, I think the Minnell claim essentially comes down to either he's the final decision-maker for the city or he isn't. I don't – and I don't think this is a huge Minnell claim. If there's no constitutional violation, we don't even get there. I would like to just ask this Court to consider one other scenario. And I want you to assume that all the facts in this case are the same except one difference. Yuvia's father puts her up to accusing Mr. Guerrero of being a drug user and a drug dealer, okay? Instead of saying he's a child molester, her dad says, you know, I'm out to get this guy. You spend time with him. You see him. You go tell the police that you see him shoot up and he's a drug dealer and a drug user. And the police come to Mr. Guerrero and they interview him. He cooperates. I'll take any test you want. I'll take a polygraph. I'm meeting you without a lawyer. And he says, you know, I'm a diabetic. I shoot insulin every day. That's this case. That is this case. And is the Court going to say, well, because we're more concerned about protecting children from child abuse and molestation than we are from being around drug users, that we're going to put the bar different in cases when the allegations from a child are of child molestation than if she had said he's a drug user, he's a drug dealer? The time of child molestation is complete. The father, the child, and the adult are drug dealing involved. Some of the people are legal investigators. But if the client had done the things that this would usually do, I recognize that there would have been nothing except ---- I respectfully disagree for three reasons, and this is the testimony of police officers. Ninety-nine out of 100 times, they do not prosecute these cases unless they have something more than just the word of a child. And it is either physical evidence of maybe something. It might be semen. It might be some tears around the vagina. If there's some physical evidence that something went on. Or number two, there's another witness, an independent witness. It might be another child in the home. It might be a neighbor. It might be the mother. It might be a relative. Somebody else in the home has witnessed it. We've got another witness. We're dealing with somebody, a suspect who's got a history of allegations made against him of child molestation. And so usually, and this is the evidence in this case, people are not prosecuted unless, in addition to the unconfirmed, uncorroborated report of a child, you don't have something else. Well, but if I concede it wasn't a perfect investigation, that doesn't mean it was a constitutional violation. And you had three separate statements made by the minor to three separate people saying that there was improper touching. How is that not probable cause? What is improper touching? Touching the buttocks, touching the vagina, touching the chest area. That is not what three independent people said, number one, necessarily. It was more vague than that. And number two, what you had was a situation where these allegations are made in the context of a custody battle. Any investigator worth his salt, and Tittle even admitted he was aware of the phenomenon of sexual assault incident to divorce. The other experts who evaluated her, they didn't refer it for prosecution. At KSARC, Mary Slaughter, the expert, she evaluated her. She interviewed her. Did she refer it for prosecution or arrest? No, she didn't. Did Euler refer it for prosecution or arrest? No. Officer Donsbach, who initially interviewed her with a social worker, Zaragoza, who specializes in evaluating child abuse, they interviewed this child. Did they refer it? Did they make an arrest or prosecution? No. The other experts in this case all talked to this girl, all looked at all of the other factors and evidence in this case, and decided not to arrest and prosecute. So I submit to you, if we're going to rely on other people, other experts, and they do the same investigation, they basically have the same information Tittle has, and they decide not to refer it, not to make an arrest and refer it to prosecution, I submit that supports my point that you need more. And why do you need more? Because children are easily manipulated. And that is the basis of the crime of the ---- I apologize. I appreciate the Court's time. Thank you. Good morning, Your Honors. May it please the Court. My name is Deputy City Attorney Evan Akron. I represent the city and county of San Francisco, and this is Captain Steven Tittle. I think plaintiff's example or appellant's at the end is actually a good one. The difference between drug dealing and child molestation, on the one hand, they're factually different types of crimes, as the Court pointed out, but it leads us to my point, which is that the charging statutes are very different. And that's something that the appellant seems to not want to talk about. Penal Code 288.5, which is what Mr. Guerrero was charged with, is designed under California law to deal with precisely the situation that the police officers faced here. And under the state cases that we cited to you, that statute is designed to prosecute a resident abuser or someone that has access to a child and where the child cannot come up with precise descriptions of the conduct and precise dates and times and exactly what happened when. It is a course of conduct statute. And the cases that we quoted you, it covers generic testimony of abuse from young victims, and it does not put unrealistic precision demands on a child witness. And that's built into the case law, into the statute, which is all that's required to prove a case beyond a reasonable doubt. So it takes into account that a child may tell different stories to different people. It's not an uncomfortable fact that a certificate of at least misstated facts and quite possibly fabricated, is no longer disclosed to anybody, a patient, and yet he presents it as being fabricated. That's incorrect, Your Honor. Tittle made one mistake, and in his affidavit, which is 506 of the record, he said that Yuvia complained that Guerrero often digitally penetrated her vagina. It's the word often that was the mistake. She explicitly told him in her interview of penetration. So digital penetration of her vagina, she did tell him. There was no discussion of how often that took place. So the word often is the incorrect part. And I refer you to those facts to Tittle's interview, and that is excerpts of record page 152 and 153. This is his interview with her? This is Tittle's interview with the victim, with Yuvia. And if you start on excerpt of record 152, it's the last question. It's all the way down at the bottom of the page. Well, he said, underneath your underwear. I see what he says. Inside or outside? Inside your father's. Correct. And then he follows on the next page. This is page 153. It's approximately in the middle of the page. Question. So he see that's inside. So he touched inside. Answer. Uh-huh. Question. Of your privates, too? Answer. Oh. So Judge Henderson found that Yuvia clearly talked about being touched inside her privates. And then there are parts of the record where he asked her what did he use. Well, I don't want to be too clinical about it, but I guess inside the privates and penetrated didn't touch. Yeah, that's, if you read the interview. If you sort of don't want to be too graphic about it, as I have, I thought. Yeah, he goes through a litany with her. He asks her, do you know the... It actually seems to suggest greater depth than what I, maybe that's a matter of interpretation. But he did say off. Yes. There's no indication of that. Correct. You could infer. I didn't mean to interrupt you. I'm sorry. You certainly, by reading the interview, she talks about course of conduct, how often things happen. So it's perfectly reasonable for the officer to have inferred that these things happened often. It was incorrect for him to say that Yuvia said digital penetration happened often. And that was the point. And Judge Henderson... But then there was another mistake. He left out, he said that I attempted to contact Guerrero with negative results. Plaintiffs have said that infers that he was unable to contact Mr. Guerrero. It could mean that he contacted Mr. Guerrero and he was unpleased with the results. We do probably agree that plaintiff is entitled to an inference. If a jury could infer that I attempted to contact Guerrero with negative results means that he was unable to find him, then that would be incorrect because he did interview Mr. Guerrero. He had negative results. Mr. Guerrero denied the crime and talked about a whole bunch of different things. If you give plaintiff an inference, then what it sounds like, you know, this is a shifty character who was maybe high in the race. It could be just as likely that he was unable to find him. I think it's a neutral statement. I attempted to find him. I had negative results. I wasn't able to find him. If you're going to take the inference that there was no interview conducted, then that's a false statement. We would concede that. Well, as the courts have recognized, there's almost an infinite amount of facts that can go into a warrant affidavit. So if plaintiff says we should have added that fact, let's just put it in for the sake of argument. So let's pretend that it'll put in I was aware that there was a custody dispute because that's what he was aware of at the time. There was. There was a custody dispute. Everyone was aware of it. So if that fact appeared in his affidavit, the question is would that change probable cause? And the answer is clearly no. What we already have in the affidavit is uvious, consistent complaints of improper touching. We have at least one complaint of digital penetration of her vagina in the warrant affidavit. Also included in the warrant affidavit was Elaine Euler's statement, the letter that she wrote to UVA, in which she says UVA described improper touching on her bottom and her buttocks, that these were not nice touches, that these happened over a long period of time. So if you take all that information and you add the exculpatory facts, which is that Guerrero was interviewed, Guerrero offered to take any tests, that there was a custody dispute going on if the inspector had added all those things. And I think the plaintiff wanted also the case arc notes added. And the case arc is the expert interview that was done. The case arc notes, it's correct, UVA did not describe penetration. But in the case arc notes, she described explicitly improper touching in her vaginal area. So those notes would have been added to the mix, and the magistrate would have seen all that. And plaintiff has to establish that no reasonable magistrate would have issued a search warrant based on that evidence. And the case law is clear that with a magistrate knowing the statements UVA made to the therapist, Euler, she would have known the statements that UVA made to Tittle and would have known the statements that she made to the case arc interviewer, all three times describing conduct that is lewd and lascivious under the statute, under California law, even knowing that there was a custody dispute then and even knowing that Guerrero had submitted to an interview, there's still probable cause. And as a matter of fact, there's still evidence to convict Guerrero beyond a reasonable doubt based on all of that. If we had a trial and the jury heard Euler, Tittle, and Mary Slaughter, the case arc nurse, testify and also heard the facts that plaintiff wished was included in the warrant, the jury could still convict him. All the elements of the crime have been met by substantial evidence under California law, and that conviction wouldn't have been reversed. So it's hard to see how a warrant containing all of that information would be an improper warrant. We still have evidence of every element of the crime in the warrant, even as corrected the way the plaintiff would want to see that warrant. Thank you. Can I take a minute with Mr. Scott, please? Mr. Scott? Yes. The certification of compliance in your brief says that the brief contains 10,160 words. Is it your position any type size goes? No, it is not, Your Honor. Do you, as a matter of course, certify type size? As a matter of course, I rely on my legal secretary to do that, Your Honor. A secretary? I believe I do, yes. Yes, Your Honor. Are you using a computer? Okay. I don't think it's 14-point type. Well, I apologize for that. Okay. This is a practice point, counsel. Yes. Our eyes are getting longer. Well, Your Honor, as I age, I have now gotten to use reading glasses.  When you get a cataract, you're in real trouble. A good point, and I will pass it on. May I make one point? Thank you. The interview that was referred to of the victim by Officer Tittle, we've highlighted that portions in our brief. We've set it forth verbatim at pages 8 through 10 of our brief. If you look at that interview, it starts out, the key portion where he's getting to the nitty-gritty, inside-outside. The first question he asks her is, do you know that, and remember, this is a six-year-old girl, do you know the difference between inside and outside? What is her answer? No. When he asks her, do you know the difference between inside and outside, her initial answer is no. Then a little further, and we're at pages 522, 523 of the record here, the first time he asks her, did he ever touch you on the inside of your privates? Her answer is no. So he starts interviewing her, and now he tries to lead her down the primrose path and start putting words in her mouth to try to make it sound like she's saying, yes, he touched me on the inside. There's a real question here, did she even understand what he was talking about? And when he first asked her, did he touch you on the inside of your privates, her initial answer was no. Thank you. Very quiet with respect to the initial answer. No. But is this the probable cause? Is this it? Does this give ñ like if she had said, if the question was, well, do you see him doing drugs, you know, shooting drugs, okay, and first she said no, and then she said yes, and it turns out he's a diabetic. Stop the question. Anytime somebody says no, I don't do it. Police questions will be much shorter, and there will be much fewer confessions of people who just don't know. I agree. She's not a criminal suspect. She's a six-year-old girl who's being manipulated by her father in a textbook case of sexual assault incident to divorce. That's what this case is. And to try to, you know, to take it out of that context and do all the what ifs and but this, but that, thank you.
judges: Beezer, Kozinski, Carney